IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs November 14, 2017

**QUANYA REVELL PREWITT v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2012-A-48        Cheryl A. Blackburn, Judge**

_____

**No. M2017-01029-CCA-R3-PC**

_____

The Petitioner, Quanya Revell Prewitt, appeals the denial of her petition for post-conviction relief from her conviction for possession of dihydrocodeinone in a school zone with intent to sell. She argues that she received ineffective assistance of counsel and that the State committed prosecutorial misconduct. After review, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and NORMA MCGEE OGLE, JJ., joined.

Andrew Chad Davidson, Nashville, Tennessee, for the appellant, Quanya Revell Prewitt.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Glenn R. Funk, District Attorney General; and Megan M. King, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In 2012, the Petitioner was indicted and convicted of possession of dihydrocodeinone in a school zone with intent to sell, and she was sentenced to three years in confinement at 100% followed by one year of probation. The Petitioner appealed, and this court affirmed the judgment of the trial court on June 26, 2013.

The underlying facts of the case were recited by this court on direct appeal as follows:

On July 12, 2011, Metropolitan Nashville Police Department ("Metro") Officer Charles Large was on patrol when an employee of the Z-Mart gas station approached him in the parking lot of the station and made a complaint. Based upon the information he received, Officer Large asked the [Petitioner] and another individual, Tory Crawley, to come to his car. Mr. Crawley showed Officer Large "a bunch of pills," and Officer Large confiscated the 12 pills.

During this time, the [Petitioner], who had not complied with the officer's request to come to the car, walked to "the side of the building next to a dumpster and a light pole." After standing there for 20 or 30 seconds, she then walked to where Officer Large stood with Mr. Crawley. After the [Petitioner] denied any knowledge of the pills confiscated from Mr. Crawley, Officer Large walked to the area where the [Petitioner] had gone after exiting the store and "found a prescription pill bottle sitting on a light post base with her name on them." The bottle was labeled with the [Petitioner]'s name and the prescription name "hydrocholorothiazide," and it contained 17 hydrocodone pills identical to those taken from Mr. Crawley.

Officer Large placed both individuals under arrest, and as they drove to the police station, the [Petitioner] "said that she just wanted to trade the pills for beer because she had been drinking and wanted more to drink."

Officer Large utilized a map prepared by Metropolitan Planning Department cadastral analyst Thomas Corcoran and which highlighted a 1,000 foot "buffer" around Cameron Middle School to demonstrate that the Z-Mart parking lot was located inside the buffer.

Mohammed Ayesh was working at the Z-Mart on July 12, 2011, when the [Petitioner] came to the counter, placed some pills on the counter, and asked if she could trade the pills for beer. The cashier asked the [Petitioner] to leave, and then either Mr. Ayesh or the cashier reported the incident to Officer Large.

Chemical testing by the Tennessee Bureau of Investigation ("TBI") established that the pills confiscated from the [Petitioner] and Mr. Crawley were hydrocodone, the same chemical compound also known as dihydrocodeinone and sold under the brand name Vicodin.

Hydrocholorothiazide, the medication for which the bottle was labeled, does not contain dihydrocodeinone but is instead a diuretic.

The [Petitioner] testified that she was prescribed hydrocodone on July 1, 2011, for pain associated with an injury. She said that she went to the Z-Mart on July 12, 2011, to purchase cigarettes and that when she got inside, she saw Mr. Crawley "in it seemed like an altercation with the clerk," so she left the store. She claimed that she did not see Officer Large and did not hear him call to her the first time. She said that she stopped when the Officer called a second time and that she placed the pill bottle next to the light post because she was aware that she had hydrocodone in the wrong prescription bottle. She claimed that the hydrocodone pills got into the hydrochlorothiazide bottle when all her pills spilled into her purse.

The [Petitioner] denied drinking on the night of the offense and maintained that she did not attempt to trade her pills for beer. She claimed that she was simply walking to a friend's house and not trying to evade Officer Large.

During cross-examination, the [Petitioner] said that when her friend telephoned and asked the [Petitioner] to come to her house, she "picked up a pill bottle and put it in [her] purse" and headed to the friend's house despite the late hour. She insisted that she grabbed the pills because she thought they were either for her hypertension or hyperthyroid and that she intended to take them the following morning. She said that, inexplicably, two bottles of medication had emptied into her purse at the same time and became mixed together. Despite having said during direct-examination that she combined the pills into a single bottle, she claimed that she randomly returned the pills to two bottles. She could not explain how the bottle for hydrochlorothiazide came to contain only hydrocodone pills.

The [Petitioner] said that she used her cellular telephone to call her friend from the parking lot of the Z-Mart just after she exited the store ahead of Mr. Crawley. She denied that she and Mr. Crawley exited the store together and insisted that Officer Large was lying when he said that they did. Despite having claimed on direct examination that she put the pill bottle on the ground because she knew that the pills were in the wrong bottle, she denied knowing that hydrocodone pills were in the bottle. The [Petitioner] also confusingly claimed that she "didn't have nothing but one bottle" and that her other pills must have been "in the other bottle." She

claimed that the officer lied when he testified that she told him that she had tried to trade the pills for beer.

State v. Quanya Revell Prewitt, No. M2012-01627-CCA-R3-CD, 2013 WL 3282869, at *1-2 (Tenn. Crim. App. June 26, 2013), perm. app. dismissed (Tenn. Oct. 20, 2014), perm. app. denied (Tenn. Jan. 19, 2016).

On February 26, 2014, the Petitioner filed a petition for post-conviction relief, and on June 27, 2014, the post-conviction court dismissed the petition without prejudice noting that "[t]he State agreed that Petitioner is entitled to a delayed Rule 11 appeal." On October 20, 2014, our supreme court dismissed the Petitioner's application for permission to appeal as untimely. Thereafter, on January 20, 2015, the Petitioner filed another petition for post-conviction relief. An amended petition was filed through appointed counsel, and the court conducted an evidentiary hearing on May 27, 2015. The testimony focused on the four primary grounds for relief raised in the petition: (1) counsel was ineffective for failing to adequately investigate the Petitioner's case and consult with her about the facts of her case and nature of the charges against her, as well as her options; (2) counsel was ineffective for not requesting an interpreter for witness Mohammad Ayesh and allowing him to testify to hearsay, and by not presenting evidence in her defense; (3) counsel was ineffective for failing to timely file a Rule 11 application for permission to appeal; and (4) the State engaged in prosecutorial misconduct by filing a superseding indictment for the purpose of intimidating the Petitioner, and counsel was ineffective for failing to file a motion to dismiss the superseding indictment.

At the hearing, the Petitioner testified that she was originally charged with simple possession of a controlled substance and counsel was appointed to represent her in general sessions court. At some point, a superseding indictment was issued charging her with possession of a controlled substance in a school zone with intent to sell. Counsel represented her at trial, and she was convicted. She recalled that after the result of her "first appeal" came back, counsel told her that it would cost $600 to file another appeal. When she could not come up with the money to file the appeal, "[her] bondsman called [her] and told [her] that [she] had to come and surrender." The Petitioner was, therefore, unsure whether a Rule 11 Application for Permission to Appeal to the Tennessee Supreme Court was filed in her case.

The Petitioner testified that counsel was ineffective for failing to investigate and consult with her about her case. She did not recall meeting with counsel prior to the trial, saying, "I think we met once at the location . . . where the police arrested me, but I rarely interacted with him or would discuss the case." However, she "believe[d]" that she met with counsel at status court dates but could not recall the number of times. She said that counsel did not provide her with copies of discovery or review the discovery with her on

- 4 -

any occasion. She claimed that counsel should have advised her about the school zone element of her offense before trial, elaborating:

> I wasn't aware that the school – that it would – it would go from a forty-five-day sentence, from a misdemeanor to a felony, with three years at 100 percent without the possibility of parole or suspended sentence. I wasn't aware that it was three years at 100 percent including a year of probation.

The Petitioner agreed that a plea offer had been made, and counsel told her "that they were offering a year probation." However, she said that she rejected the offer because

> [counsel] informed [her] that this case was somewhat . . . a small case, . . . that up on the 6th floor they had bigger fish to fry and this case would be dismissed. And I was also trying to point out to [counsel] that the store had cameras, video cameras, and I was . . . wanting them to . . . order for the tapes . . . to come to court to prove that I did not try to sell my pills or trade my pills.

The Petitioner claimed that she was not aware that a police officer was going to testify "that [she] was trying to trade [her] pills for beer." After she was convicted, she saw a statement in the discovery materials by the police officer stating such that had she known about beforehand, she would have accepted a plea offer rather than go to trial.

The Petitioner recalled that it was brought up at trial whether her pills were in the wrong containers, which could have been easily straightened out, but counsel did not discuss that with her prior to trial or present evidence at trial that she had two prescriptions that were in similar looking bottles. She recalled that counsel told her that "the number of pills that he got from Mr. Crawley and [her] pills added up to the quantity of the pills that were prescribed." She complained that counsel failed to present evidence that "Mr. Crawley . . . was the one that had taken the pills in the store and put them on the counter." The Petitioner said that Mr. Crawley was arrested on the same night as she and for the same offense, but his case was resolved in general sessions court. The Petitioner wanted counsel to show that it was Mr. Crawley who "came out of the store with the pills and the fact that . . . he's the one that placed the pills up on the counter." She tried to explain to counsel that "Mr. Crawley must have stole[n] [her] pills and taken them to the store." However, to her knowledge, counsel did not attempt to locate or subpoena Mr. Crawley.

The Petitioner testified that she was not taking any medications during the pendency of her trial, although she was supposed to be taking medication for schizophrenia and major depression. She told counsel about her conditions. The Petitioner denied knowing that she was facing a school zone charge until the final court date before her trial. She asked counsel

> how was it that it can go from a misdemeanor to a felony because I wouldn't take an offer. I wanted to know how is it that I was placed with a school zone on me when it wasn't my original charge, was it due to the fact that I did not take the plea, is that the reason why I was charged with a school zone. I mean, to me . . . that's charging me twice to be honest with you. . . . [T]o me it was like if you don't take this plea, then we're going to . . . make it harder on you and in essence, . . . from forty-five days to three years at 100 percent plus a year of probation.

The Petitioner complained that counsel allowed Mohammad Ayesh to testify to hearsay – that "another clerk . . . told him that's what I was trying to do was put my pills on the counter and tried to trade them." She elaborated that Mr. Ayesh initially testified that he had heard the Petitioner "say some things and then it came out later that he did not actually hear those things, that it was another clerk that told him." The Petitioner noted that when Mr. Ayesh testified at trial, he appeared to have some language barriers, but no interpreter was present.

On cross-examination, the Petitioner agreed that shortly after counsel was appointed in general sessions court, "an offer was made to [her] to plead to simple possession and have a couple of days to serve." She rejected that offer and "wound up in [c]riminal [c]ourt" where she had multiple court appearances. She denied receiving an offer in criminal court "to plead to simple possession and get nine months with a sentencing hearing." The only offer she recalled receiving in criminal court involved a sentence of a year of probation, which she rejected. The Petitioner admitted that she was aware that the State was going to seek a superseding indictment, changing her charge from a misdemeanor to a felony.

The Petitioner denied meeting with counsel several times leading up to trial but conceded that she and counsel went to the crime scene together. She did not recall counsel taking photographs at the crime scene, counsel explaining the drug-free school zone law to her, or speaking with counsel about the facts of the case. She said that counsel did not show her the discovery materials. She did not have any memory of counsel taking her to Elam Mental Health Facility, claiming she went on her own. She also did not have any memory of being arraigned on the felony drug charge after the State brought back a superseding indictment.

Counsel testified that he was appointed to represent the Petitioner in general sessions court, and he appeared with her "at least twice, maybe three times" in that court. At the general sessions level, counsel and the Petitioner

> went over the facts of the case as much as we could. And then we discussed what the district attorney had offered as a plea deal, and then I made a counter offer and just basically told [the Petitioner] that she . . . c[ould] take this plea deal, we can try to have a trial here in sessions or you can have a preliminary hearing or you can bind it over on waivers, do whatever you want to. I just conveyed the offer and told her what her options were.
>
> . . . .
>
> Her decision in this case – I got the State down to ten days to serve. I believe she maybe had served three or something to that extent. She said that she – I recall her saying she was about to get her SSI check or something to that effect and that she would rather bond out and fight the case rather than take anything. And . . . I think she might have wanted to bind it over on waivers. I don't think we had a preliminary hearing.

Counsel recalled that he met with the Petitioner "on at least two or three discussion dates." However, when the Petitioner came to court, "somebody was under the impression she was intoxicated and . . . it seems like it was two or three dates she ended up being locked up to where [counsel] couldn't really talk to her." Counsel elaborated that he tried to talk to the Petitioner at those times, but he did not "want to have a meaningful legal discussion with somebody who is too drunk to be in court."

The Petitioner was arraigned on the superseding indictment, and counsel filed for discovery. After that, counsel "met with [the Petitioner] numerous, numerous times," including times outside of court appearances. He recalled specifically meeting with her at the gas station where the incident in the case occurred.

Counsel testified that he went over the discovery with the Petitioner, noting that "this was one of the worst cases I've ever had to deal with just because of the facts of the case and somebody not wanting to . . . take a plea deal, just due to the amount of evidence." Counsel said that he explained to the Petitioner that "within a thousand feet of the school zone" was not the same as "the driving on the road school zone." Counsel remembered that the State made a plea offer at the criminal court level, but he did not recall the specifics of the initial offer other than that it was "somewhat higher than what

- 7 -

was offered in sessions. . . . [A] misdemeanor offer with some time to serve. And she could petition if she were to complete a drug and alcohol program . . . before that amount of time to serve had expired." He discussed the offer with the Petitioner, but she "wasn't interested in accepting it."

Counsel recalled that the Petitioner had several court dates to consider the misdemeanor offer, and counsel tried to negotiate with the prosecutor. At some point before the superseding indictment was brought, the prosecutor informed counsel that the Petitioner "could take the offer that he had made that day, or he would file a superseding indictment." Counsel asked that the Petitioner have a week to make the decision because she had been "taken into custody because of her intoxication," and counsel explained to the Petitioner that "it would be a new and different charge carrying a lot higher range of punishment." Counsel believed that the Petitioner understood that the new charge would require that she serve time.

Counsel testified that he investigated Mr. Crawley and, based on Mr. Crawley's record, did not think he would be a beneficial witness. Counsel said that he and the Petitioner "discussed at length the medication she was taking . . . [and] why she was taking it." Counsel talked to clinicians at Elam Mental Health Facility to make sure the Petitioner's medications did not prevent her from understanding what was happening.

Counsel testified that he prepared for trial and spoke with witnesses, including Mr. Ayesh. Counsel acknowledged that English was not Mr. Ayesh's first language and that "he can be a little difficult to understand." However, after talking to Mr. Ayesh, counsel's position was that "the last thing [he] wanted the jury to hear and understand [was] what [Mr. Ayesh] had [t]o say [as] . . . he wasn't a favorable witness to say the least." Therefore, counsel did not request an interpreter for Mr. Ayesh because he "didn't want anybody to understand what he was saying."

As to the Petitioner's allegation that counsel should have presented evidence that Mr. Crawley committed the crime, counsel said, "I would have loved to have known that Mr. Crawley stole her medication. This is the first time I've ever heard about that." Asked about his failure to file a Rule 11 application for permission to appeal to the Tennessee Supreme Court, counsel explained:

> I filed the initial appeal, and then [the Petitioner's] sister, who I had been trying to get help from regarding alcoholism or drug use and things like that or just her family history, I never heard anything from any family until after the trial. So after the appeal, her sister came in and informed me that they were hiring somebody to appeal to the Supreme Court. I informed [the Petitioner] and her sister that they had a certain amount of time to file the

appeal and that there was a fee involved with filing that appeal. I said, if you want to hire another attorney, that's fine. Contact me if you don't. I never heard anything, so I assumed that there was an issue with the appeal bond and they just never were interested in that.

On cross-examination, counsel admitted that he failed to request that he be relieved as the Petitioner's counsel after the conclusion of the direct appeal, explaining, "I was under the impression she had retained counsel. I should have gotten that in writing. I did file the appeal to the Court of Appeals, but I did not file anything to the State Supreme Court." With regard to evidence about the Petitioner's bottles of medication, counsel testified that he considered whether the Petitioner's pills and bottles looked similar and "that perhaps she had confused which pills went in which bottle" but conceded that he did not present any such evidence. Counsel explained:

[I]n that regard my worry was that looking at the discovery the Lortabs appear to be the same. What I was worried about was that we had the testimony from the officer and the testimony from the gentleman that was working at the cash register.

. . . .

And I didn't want the . . . jury to think that she had this caché of just a big variety of pills that she was trying to trade. After having already spoken to the clerk, the clerk was definitely going to say that she was trying to trade medication for the beer. So I felt like that would probably leave an even worse impression on the jury if we had several different opiate drugs of different varieties.

Counsel testified that he provided the Petitioner with a copy of her discovery and went over it with her "as far as what affects this case." Counsel recalled that, in addition to eight occasions when the Petitioner appeared for court proceedings, he met with her out of court as well. He elaborated:

I picked her up at her house to go meet at the gas station. I've met her at the gas station. I had met with her at my office at one point. It was either my office or I may have – I don't live too terribly far from her. Maybe she met in this common area close to my condo, I think, at one point. Yeah, I definitely met with her outside of this courthouse several times and a couple of times at Elam.

Counsel testified that he did not think the Petitioner was intoxicated when he met with her and thought she "sobered up a little bit" as the case progressed. He said that he took her to Elam Mental Health Facility to have her evaluated because she "kept being taken into custody every court date." He also wanted to make sure she was competent and understood the things he discussed with her, given she had "a possible three year at a hundred percent sentence hanging over [her] head and on the other hand . . . ha[d] a misdemeanor offer."

Counsel testified that he met with the Petitioner on two or three court dates between her arraignment on the superseding indictment and trial. He said that he would not have discussed the school zone issue with the Petitioner before the superseding indictment because it was not yet an issue. Counsel recalled that on the day the Petitioner was going to be indicted on the superseding indictment, the Petitioner was intoxicated when she appeared in court and was taken into custody. He met with her when she was released, and they "went to the location so [they] could discuss the school zone."

Counsel recalled his conversation with the prosecutor regarding the superseding indictment:

I think he was a little perturbed that . . . it was a simple possession misdemeanor charge that kept lingering and kept lingering. And I think he was bothered that the offers he was making – I would go back and convey them but, you know, General she's intoxicated, she's in the back, there's not a whole lot we can do. I would convey them to her, and she might just not want the offer. And so then he finally got to the point where he said if she doesn't plead to – I forget what the exact offer was. But if she doesn't plead to this deal, then I'm going to supersede indict her under the school zone drug charge.

Counsel said that there was no reason for the superseding indictment other than the Petitioner's refusal to accept a plea offer.

In an order filed on October 14, 2015, the post-conviction court denied post-conviction relief but granted the Petitioner a delayed Rule 11 appeal. The Petitioner filed a notice of appeal on October 20, 2015. While the post-conviction appeal was in progress, our supreme court denied the Petitioner's application for permission to appeal this court's direct appeal decision.

On March 8, 2017, this court determined that the post-conviction court failed to comply with the mandates of Tennessee Supreme Court Rule 28, section 9(D)(1)(b)(i), which requires a post-conviction court to stay proceedings pending the final disposition

of a delayed appeal. This court reversed the denial of post-conviction relief and ordered that, on remand, the Petitioner be allowed to "amend the original petition to challenge any 'new issues cognizable in a post-conviction proceeding result[ing] from the handling of the delayed appeal.'" The post-conviction court conducted a status hearing on March 24, 2017, after which it relieved post-conviction counsel and appointed new counsel to represent the Petitioner "on any further post-conviction proceedings." The court directed new counsel to "consult with the Petitioner to determine whether to amend her post-conviction proceeding to include any issues resulting from the delayed appeal." On April 24, 2017, new post-conviction counsel filed a notice that there were no new issues to add to the previously filed amended petition for post-conviction relief. On May 9, 2017, the post-conviction court "issue[d] the final order . . . denying [the] Petitioner's request for post-conviction relief for all the reasons stated in [its] October 14, 2015 [o]rder."

## ANALYSIS

The Petitioner argues that she received ineffective assistance of counsel and that the State committed prosecutorial misconduct.

The post-conviction petitioner bears the burden of proving his allegations by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f). When an evidentiary hearing is held in the post-conviction setting, the findings of fact made by the court are conclusive on appeal unless the evidence preponderates against them. See Tidwell v. State, 922 S.W.2d 497, 500 (Tenn. 1996). Where appellate review involves purely factual issues, the appellate court should not reweigh or reevaluate the evidence. See Henley v. State, 960 S.W.2d 572, 578 (Tenn. 1997). However, review of a trial court's application of the law to the facts of the case is de novo, with no presumption of correctness. See Ruff v. State, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel, which presents mixed questions of fact and law, is reviewed de novo, with a presumption of correctness given only to the post-conviction court's findings of fact. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001); Burns v. State, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner has the burden to show both that trial counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceeding. Strickland v. Washington, 466 U.S. 668, 687 (1984); see State v. Taylor, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that same standard for determining ineffective assistance of counsel that is applied in federal cases also applies in Tennessee). The Strickland standard is a two-prong test:

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

The deficient performance prong of the test is satisfied by showing that "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." Goad v. State, 938 S.W.2d 363, 369 (Tenn. 1996) (citing Strickland, 466 U.S. at 688; Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the test is satisfied by showing a reasonable probability, i.e., a "probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

Courts need not approach the Strickland test in a specific order or even "address both components of the inquiry if the defendant makes an insufficient showing on one." 466 U.S. at 697; see also Goad, 938 S.W.2d at 370 (stating that "failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

The Petitioner argues that counsel rendered ineffective assistance because he failed to "conduct appropriate investigations" or "adequately meet" with her to "adequately discuss" her case and the evidence against her. She claims that counsel was also ineffective because he failed to call her co-defendant, Mr. Crawley, as a witness at trial to testify that he stole her prescription pills and attempted to trade the pills for beer and for allowing Mr. Ayesh to give hearsay testimony.

With regard to the Petitioner's claim that counsel failed to "conduct appropriate investigations" or "adequately meet" with her to "adequately discuss" her case and the evidence against her, counsel testified that he met with the Petitioner on numerous occasions both in and out of court. Counsel said that he went over the discovery with the Petitioner and explained the superseding indictment and drug-free school zone element once that became an issue. Counsel and the Petitioner discussed the medications she was taking, and he had her assessed at Elam Mental Health Facility to ensure her understanding of the proceedings. Counsel stated that the first time he heard the Petitioner's allegation that Mr. Crawley stole her pills to trade them was at the post-

conviction hearing. The post-conviction court found that the Petitioner "failed to show that the number of meetings [s]he had with counsel was so deficient as to constitute ineffective assistance of counsel. Nothing in the record indicates that Trial Counsel failed to meet with the Petitioner and keep her informed of the proceedings." The court also found "it not credible that [the] Petitioner maintains she *never* discussed the State's evidence against her with Trial Counsel." The record supports the findings of the post-conviction court.

With regard to the Petitioner's claim that counsel failed to call her co-defendant, Mr. Crawley, as a witness at trial to testify that he stole her prescription pills and attempted to trade the pills for beer, the Petitioner did not present Mr. Crawley's testimony at the post-conviction hearing and, thus, failed to establish prejudice. In order to succeed on a claim that counsel did not properly investigate or call favorable witnesses at trial, a petitioner must generally elicit favorable testimony from those witnesses at the evidentiary hearing, as a post-conviction court may not speculate "on the question of . . . what a witness's testimony might have been if introduced" at trial. Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990).

As to her final allegation of ineffective assistance of counsel, the Petitioner alleges that trial counsel was ineffective for allowing Mr. Ayesh "to testify regarding what another clerk overheard [her] allegedly say regarding trading her pills for beer, which was the central issue at trial." In considering this claim, the post-conviction court reviewed the trial transcript and noted that Mr. Ayesh's "rudimentary understanding of English grammar . . . caused some confusion as to whether Mr. Ayesh heard [the] Petitioner make a statement about trading pills for beer or if he was told about her statement by the cashier." However, the post-conviction court concluded that "[a] review of Mr. Ayesh's testimony in its totality demonstrates his personal knowledge of [the] Petitioner's statements and actions." We have likewise reviewed the transcript of Mr. Ayesh's testimony and conclude that the record supports the post-conviction court's determination that trial counsel did not render deficient performance.

The Petitioner also argues that the State engaged in prosecutorial misconduct by filing a superseding indictment solely because the prosecutor was "perturbed" that the Petitioner would not enter a guilty plea to simple possession. The evidence showed that the offense was in fact committed in a drug-free school zone. "Although the State may not bring a superseding indictment to harass or intimidate the accused, a legitimate decision to bring a superseding indictment is uniquely within the State's authority." State v. Harris, 33 S.W.3d 767, 771 (Tenn. 2000). "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense . . ., the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978). The post-conviction

court recalled that counsel testified that once the superseding indictment was obtained, he met with the prosecutor to confirm that the offense occurred in a drug-free school zone and such was verified. The court noted that it was not an uncommon practice at the time of the Petitioner's case for the State to seek a superseding indictment as a case progressed in cases where the offense occurred in a drug free school zone. The post-conviction court found that "[o]ther than speculation, there is no evidence before the Court indicating that the State sought the superseding indictment to harass or intimidate [the] Petitioner." The record supports this determination.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the denial of the petition.

_____
ALAN E. GLENN, JUDGE